ORIGINAL

**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

FILED
JUN 16 2008
U.S. COURT OF FEDERAL CLAIMS

ROLAND S. ROLLINS, SR., )
Plaintiff, )
)
v. ) No.08-
) (Judge )
THE UNITED STATES, )
Defendant.)

08-433 C

## DISCHARGE REVIEW COMPLAINT

Petitioner, makes the following complaint seeking relief from discharge status from the U.S. Army and an appeal from denial of relief from discharge status by the Army Board for the Correction of Military Records on 25 January 2008.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1346, 1332(a) and 1361.

2. Petitioner's claim for relief arises under the following statutes:

a. 10 U.S.C. § 1201 (retirement act);

b. 28 U.S.C. § 1346 (Tucker Act); and

c. 10 U.S.C. §1552, and 28 U.S.C. §1291

3. Petitioner has exhausted all administrative remedies before the Army Board for Correction of Military Records and all other relevant administrative review processes available to him.

4. Petitioner files this complaint within six years of the date of the final decision of the Army Board for Correction of Military Records.

## EXHIBITS

5. The Administrative Record before the Army Board for Correction of Military Records consists of more than 2,600 pages. References to documents in this Complaint are to the documents in the unpaginated Administrative Record, which are incorporated by reference and made a part of this complaint.

## PARTIES

6. Plaintiff, Roland S. Rollins, Sr., is a citizen of the United States and of the State of Delaware, and served in the U.S. Army for more than 90 days beginning on 28 February 1979 and terminating on 1 July 1982, as shown by copy of Form DD-214 (Separation from Service).

7.. Hon. Pete Geren is Secretary of the United States Department of the Army, from on or before 16 July 2007 to date. The Secretary of the Army is a constitutional representative of the President of the United States and is charged with the control and administration of the United States.

8. The Hon. Les Brownlee was Acting Secretary of the Army from 25 April 2003 until 16 July 2007. The Acting Secretary of the Army is a constitutional representative of the President of the United States and is charged with the control and administration of the United States Army

until such time as the Senate confirms the Secretary of the Army.

9. Hon. Thomas E. White was Secretary of the United States Department of the Army, from on or before 21 January 2001 until 25 April 2003. The Secretary of the Army is a constitutional representative of the President of the United States and is charged with the control and administration of the United States.

10. At all times material to this claim, the following persons were agents, servants and employees of the United States Department of the Army:

a. Carl W.S. Chun. Director, Army Board for Correction of Military Records on or about from on or about 15 December 2006 to and including September 2006;

b. Catherine C. Mitrano, Director , Army Board for Correction of Military Records on or about from on or about 15 December 2006 to and including 8 January 2008;

c. Beverly A. Young, analyst for the Army Board for Correction of Military Records on or about 15 December 2006 to and including 8 January 2008;

d. David Haasenritter, Member of the Army Board for Correction of Military Records on or about 15 December 2006 to and including 8 January 2008;

e. James Hastie, Member of the Army Board for Correction of Military Records on or about 15 December 2006 to and including 8 January 2008;

f. Edward Montgomery, Member of the Army Board for Correction of Military Records on or about 15 December 2006 to and including 8 January 2008;

11. At all times material to this claim, the persons enumerated in paragraph (8) acted on behalf of the United States of America and on behalf of the Department of the Army as agents, servants and employees acting within the scope of their employment.

## PROCEEDINGS BEFORE THE BOARD FOR CORRECTION OF MILITARY RECORDS

12. In November, 1984, Rollins filed a DD-293 seeking discharge review by the Army Discharge Review Board.(ADRB) ( Form DD-293 dtd Nov. 1984)

13. The ADRB noted that Rollins sought to change his re-enlistment code in order to re-enlist and forwarded his application to the Army Board for Correction of Military Records (ABCMR) for action. ( Ltr. of Elizabeth B. Tatum to R.S. Rollins dtd 30 Nov. 1984; 172, Ltr of Wynema Smith to R.S. Rollins dtd 30 Dec. 1985)

14. On 7 January 1987, the ABCMR denied Rollins' application on the ground that no new and material evidence had been presented to the ABCMR warranting a change of re-enlistment code. (Decision dtd 7 Jan 1987) A supporting medical advisory opinion from Col. Orest Hawryluck, MC, stated that Rollins was medically fit for active duty.

15. On 15 September 2006, Rollins filed a discharge review application with the Army Board for Correction of Military Records to correct his military records by re-opening his original

discharge for purposes of receiving a physical and mental evaluation and for consideration of disability retirement pay or severance pay. (Form DD-149 dtd 15 Sep.2006)

16. On 8 January 2008, the Army Board for Correction of Military Records voted to deny Rollins' request to correct his record, as shown by copy of Board Decision marked "Exhibit A" in 11 pages and incorporated by reference as part of this Complaint.

## ALLEGATIONS OF FACT

### Military Service History

17. Roland S. Rollins, Sr., enlisted in the U.S. Army on 28 February 1979. ( DD-214 -1)After basic training, he was assigned to U.S. Army Medical Training Facility, Ft. Samuel Houston, TX where he qualified as a medical specialist.

18. Rollins was then re-assigned to Company A 307th Medical Bn., 82nd Airborne Division, Ft. Bragg, NC.

19. On 1 July 1982, he was honorably discharged for unsuitability due to a personality disorder with the rank of Specialist 4th Class (E-4). Rollins did not receive a Medical Board nor was his disability reviewed by a Physical Evaluation Board. (DD-214 dated 1 Jul. 1982).

### Service Medical History In General

20. Rollins' enlistment physical examination was normal. (Enlistment Physical Examination, SF

88 Exhibit A 11,12). Rollins answered "Yes" to "Swollen or painful joints," "Frequent or severe headache," "Chronic or frequent colds," "Severe tooth or gum trouble," "Head injury," "Broken bones," and "Bones, joints other deformity" on his Report of Medical History. (Pre- Enlistment Physical Exam and Military Medical History dated 10 Feb. 1979).

**Service Medical History Shoulder Injury**

21. On 23 August 1979, at Ft. Bragg, NC, Rollins injured his shoulder playing football, which was diagnosed as a shoulder separation. (Chronological Record of Medical Care for 23 Aug. 1979).

22. In December 1981, Rollins went to Sick Call after dislocating his shoulder twice the previous night while sleeping. He reported 3 other shoulder dislocations in the previous year (Chronological Record of Health Care dtd 28 Dec. 1981).

23. Rollins was referred to a physical therapist at Womack USAH for consultation Rollins had another night-time shoulder dislocation on 23 April 1982 as shown by Chronological Record of Health Care for 23 Apr. 1982

24. In May 1982 Rollins went to sick call complaining of pain associated with his chronic dislocating shoulder. He was referred to Womack USAH for an orthopedic consultation as shown by Chronological Record of Health Care for 20 May 1982.

25. Doctor A. Mittnach saw Rollins on 20 May 1982. His diagnosis was that Rollins suffered from: recurrent dislocation of his right shoulder. (Exhibit B 163) Doctor Mittnach recommended a change in PULHES for " no crawling, hand to hand combat, contact sports handling heavy materials." (Physical Profile Board Proceedings of 21 Jun. 1982).

**Service Medical History: Flat Feet**

26. In September, 1979, Rollins reported to sick call complaining of burning pain in both feet and pain in his left knee. He was diagnosed as having "fallen arches: and was referred for a Podiatric Consultation. (Chronological Record of Health Care for 21 Sep. 1979).

27. In November 1979, Rollins saw a Podiatrist who gave Rollins a diagnosis of "pes planus foot type b/c/ flexible". Doctor Srankate D.P.M. (Phonetic) stated that "Rollins has flexible flat feet, no gross deformity noted. Pronation syndrome noted. Dx flat feet w/ pronation syndrome." (Consultation Sheet dated 8 Nov. 1979.

**Service Medical History: Back and Foot Injuries**

28 . In April 1980 Rollins stepped in a hole and injured his left knee and shin. He went to Sick call and was given a diagnosis of "contusion mid-tibia." (Chronological Record of Medical Care for 6 Apr. 1980).

29. In April, 1980, Rollins dropped a heavy loudspeaker on his right foot. He was seen for a soft tissue injury to that foot at Sick Call and treated conservatively. X-ray examination was negative for any fracture. He was put on a temporary PULHES change to "no running, jumping for 7

days." (Chronological Record of Health Care for 7 Apr. 1980).

30. Rollins was involved in a jeep accident in May 1980 at Ft. Bragg. He drove his jeep into a ditch and was taken to Emergency Treatment for evaluation. He complained of back pain at T9-10. He was diagnosed as suffering from a chest contusion. (Chronological Record fo Health Care for 12 May 1980).

31. A June 1980 follow-up examination indicated that Rollins was suffering with a lumber muscular spasm. (Chronological Record of Health Care for 12 June 1980).

32. Rollins re-injured his back and left foot in August 1980 while moving heavy equipment. He went to sick call the next day and was diagnosed as suffering from contusions and a sprain. (Chronological Record of Health Care for 27 Aug. 1980).

**Service Medical History: Diabetes**

33. In November, 1980, Rollins fell into a general malaise that included nausea and vomiting. He was seen at sick call and initially diagnosed as having viral syndrome. (Chronological Record of Medical Care dtd 6 Nov. 1980).

34. On 14 January 1981, his urine culture was negative for excessive glucose. ( Pathological Report (n.d. 14 Jan. 1981))

35. In May 1981 Rollins felt feeling light headed and vomited. He went to sick call and was sent back to duty as "normal." (Sick Call Report dtd 6 May 1981).

36. In August 1981 Rollins was sent to Womack USAH for urinalysis that showed ketones and glucose in urine . (lab analysis for 3 Aug. 1981).

37. An August 1981 blood gasses and CBC test done at Womack USAH showed a fasting glucose result of 96. (Lab report dtd 4 Aug. 1981).

38. In November 1981, Rollins experienced lower abdominal pain for 3 days. He went to sick call and the corpsman wrote that "Review of records shows several normal u/a one fasting blood sugar of 96. Medical consult ordered." (Lab results dtd 5 Nov. 1981 and by Chronological Record of Health Care for 20 Nov. 1981).

39. A December 1981 urine catch was also negative for excessive glucose. (Lab Report for 28 Dec. 1981).

**Service Medical History Acid Burn and Acne**

40. In March 1981 Rollins was working on his car with a carburetor cleaner that splashed on his face and hands causing acid burns. He was seen at sick call and was washed off by a corpsman. (Chronological Record of Medical Care for 16 Mar. 1981).

41. Rollins also had a serious skin problem. He developed an itchy rash on his face and body. In February 1982, he was seen by a dermatologist [name illegible] at Womack who gave Rollins a diagnosis of acne vulgaris. (Dermatology consult of 25 Feb. 1982).

42. In May 1982 Rollins was taken to the Womack USAH Emergency Room after he was found seated on ground with stomach pains after windsprints. Rollins had taken atarax for itching the day before. (Emergency Room Record Womack Army hospital for 13 May 1982).

43. Rollins' pre-discharge physical examination is not part of his service medical records and there is no evidence that Rollins ever received a pre-discharge physical examination.

**VA & Private Medical History: Residuals of Right Shoulder Injury**

44. Rollins went to Veterans Affairs Medical Center (VAMC) Wilmington, DE, within 90 days after his discharge from the Army. He filed his first compensation claim in July 1982, listing the following disorders as service-connected: "recurrent right shoulder dislocation since (7/79) permanent profile 21 June 83, skin disease-face, back, arms –since Feb '82,prescription for eye lenses since (June '82) viral syndrome." (VA Claim Form dated 21 Jul. 1982).

45. Rollins filed a Statement in Support of Claim (SSC) asking that "personality disorder" be added to the list of service-connected conditions. ( SSC dtd 2 Sep. 1982.)

46. In October 1982, Rollins filed a second compensation claim claiming service connection for

right shoulder dislocation, back & spinal problems, eye problems, loss of hearing, recurrent viral syndrome and personality disorder. (VA Form 21-526 dtd 15 Oct. 1982).

47. In September 1982, the Wilmington VA Regional Office (RO) made a rating decision granting Rollins 0% service connection for acne vulgaris and chronic right shoulder pain. It denied service-connection for personality disorder, refractive error and viral syndrome. ( Rating Decision dtd 28 Sep. 1982)..

48. Rollins filed his Notice of Disagreement (NOD) on 20 October 1982. The RO sent a letter to Rollins on 7 January 1983 dismissing his claims for failure to report for a physical exam. (Letter from the RO to Rollins dtd 7 Jan. 1983).

49. Rollins filed a second SSC in January 1984 requesting an increase for his right shoulder and acne, stating that he was unable to work due to these conditions. (SSC dtd 24 Jan 1983).

50. Rollins was brought to the VAMC Wilmington, DE, Emergency Room in November 1983 for treatment of injuries sustained in an auto accident. (Discharge Summary dtd 6 Dec. 1983

51. The RO notified Rollins it would not re-open his claim on 29 February 1983, because the discharge summary did not show that his right shoulder condition had become worse. (Letter from RO to Rollins dtd 29 Feb 1984).

52. In May 1984, Rollins filed a formal appeal from the adverse rating decision. ( VA Form 9 dtd 26 May 1984).

53. In June 1984 Rollins reported that he had been seen at the VAMC Emergency Room and an x-ray showed he had a separated shoulder. ( SSC dtd 21 Jun 1984).

54. Rollins also asked for an increase for his right shoulder injury. (SSC dtd 21 Jun. 1984).

55. Rollins requested a personal hearing before the Regional Office which was held 6 July 1984 at the Wilmington RO described a surgical attempt to reduce Rollins' chronically dislocated right shoulder on 25 June 1984. (Transcript of Hearing dtd 6 Jul. 1984).

56. In July 1984, Rollins was seen by Dr. V. N. Makhya on the surgical ward because of complaints about Rollins' verbal abuse of nurses. Makhya's impression was that Rollins suffered from some kind of personality disorder. (Psychiatric consultation sheet dtd 5 Jul. 1984).

57. An August 1984 Rating Decision continued the 0% ratings for Rollins dislocated right shoulder and acne. ( Rating Decision dtd 8 Aug. 1984).

58. On 12 September 1984 Rollins filed an SSC for 100% compensation because his shoulder reduction was unsuccessful and had to be re-done with shorter pin. (SSC dtd 12 Sep. 1984).

59. In September 1984, Rollins had a screw removed from his shoulder. (Post Operative Report dtd 12 Sep 1984).

60. A follow up examination in December 1984 showed marked improvement in Rollins' range of motion in his right shoulder. (Clinical record dtd 5 Dec. 1984).

61. A January 1985 Rating Decision continued Rollins' 0% disability rating for his right shoulder and acne. (Rating Decision dtd 3 Jan 1985).

62 . Rollins filed a SSC requesting an increase and TDIU benefits because he had been laid off after his surgery. (Award Letter dtd 21 Jan. 1985).

63. In February1985 Rollins submitted another SSC requesting that his 100% disability compensation for hospitalization be extended for an additional month. (SSC dtd 13 Feb. 1985).

64. In April 1985 the VA made a Rating Decision denying any increase . (Rating Decision dtd 12 Apr. 1985).

65. Rollins later re-opened his claim for residuals of his shoulder injury in January,1989. ( SSC dtd 19 Jan. 1989).

66. In May, 1994, the Wilmington RO granted 20% service-connection for Rollins' residuals

from his chronic dislocated right shoulder. (Rating Decision dated 12 May 1994).

67. In June 1991, the BVA issued its decision re-affirming the RO's Rating Decisions denying an increase from 0% for residuals of right shoulder injury and acne vulgaris. (Rating Decision dtd 7 Jun. 1991).

68. Rollins moved the Chair for reconsideration in September, 1991. The Chair denied the motion on 3 December 1991. (Letter from the Chair to Rollins dtd 3 Dec. 1991).

69. Rollins filed a timely notice of appeal with the U.S. Court of Appeals for Veterans Claims. On 10 July 1992, the Chair reversed himself and ordered that Rollins' claim be re-considered The Court of Appeals for Veterans Claims then granted the VA"s motion to remand the case to the BVA in July 1992 . ( Court order dtd 27 Jul. 1992).

70. The BVA issued a supplemental decision in April 1992, denying Rollins' claim for "multiple noncompensible service-connected disorders." (BVA Decision dtd 23 Apr. 1992).

71. The BVA issued a supplemental decision in March 1993 remanding Rollins' claim to the Wilmington RO for further development including collection of his private medical records from Dr. Cooper and a new compensation & pension examination for his shoulder and skin conditions. (BVA Decision dtd 10 Mar. 1993).

72. In November 2002 Rollins received an orthopedic compensation & pension examination at VAMC Wilmington by Dr. Glazer, who found that Rollins had. traumatic arthritis of the right shoulder and chronic cervical strain with trapezius myalgia. (Consultation dtd 13 Nov. 2002).

73. In April, 2003 Rollins saw Bonnie Fairchild RN at the VAMC Wilmington, Pain Management Clinic. He gave a history of pain in his right shoulder and in his foot. (Chronological Record of Medical Care dtd , 8 Apr 2003).

74. Doctor Delia Olympia saw Rollins that same day in the Physical Therapy Unit. She suggested that Rollins try land therapy and if he cannot tolerate land therapy, hydrotherapy. (Physical Therapy Progress Note dtd 8 Apr. 2003).

75. In June 2003 Rollins saw Dr. Robert Glazer at VAMC Wilmington for an orthopedic consultation. Doctor Glazer found some small calcifications in the left femoral head from an x-ray examination. He noted that Rollins complained of multiple joint pain, feet, ankles, neck and right upper trapezius. He gave Rollins four diagnoses: 1. Polyarthropathy, cause uncertain 2. Right ulnar neuropathy 3. Diabetic neuropathy 4. Status post tarsal tunnel release bilaterally with residual pain and sensory disturbance. (Report of Dr. Robert Glazer dtd 26 Jun. 2003).

76. In 2003, the Wilmington RO granted an increase to 30% disability for residuals of Rollins' right shoulder dislocation with effective date of 30 Aug. 2001. (Rating Decision dtd 8 Sep. 2003).

**2. VA & Private Medical History: Skin Condition: Acne Vulgaris**

77. Rollins developed an itchy skin rash during his tour of duty with the 82nd Airborne Division. He was seen by a dermatologist at Womack hospital, Ft. Bragg, NC, for this condition. (Dermatologist consultation dtd 25 Feb 1982).

78. Rollins included "skin rash" in his original 1982 claim for service-connected disabilities. That claim was granted with a 0% service-connected rating in September 1982. (Rating Decision dtd 28 Sep. 1982).

79. Rollins re-opened his 1982 claim in 1983 and the Wilmington RO denied any increase for his service-connected skin rash. (See Rating Decision dtd 17 Mar. 1983).

80. The BVA issued a decision re-affirming the RO's Rating Decisions denying an increase from 0% for residuals of right shoulder injury and acne vulgaris. (Rating Decision dtd 7 Jun. 1991).

81. Rollins moved the Chair for reconsideration in September, 1991 as alleged in paragraph (65)

82. The BVA issued supplemental decisions on 23 April 1992 and 10 March 1993 as alleged in paragraph (67).

83. In March 1994, Rollins had a Compensation & Pension examination by Dr. Hyde for his

skin condition. Hyde reported that Rollins suffered from "post-inflammatory hyperpigmentation [and] mild folliculitis present now." © & P Exam dtd 7 Mar. 1994).

84. The Wilmington RO changed the 0% rating in May 1994, when it granted 10% service-connection for Rollins' skin rash. (Rating Decision dtd 4 May 1994).

85. In April 1999, Rollins filed a statement to re-open his claim for a skin condition. (SSC dtd 7 Apr. 1999).

86. The RO responded with a Rating Decision denying an increase . (Rating Decision dtd 30 Nov. 1999).

87 The Wilmington RO wrote to Rollins in May 2002, relating to his skin condition and to depression secondary to skin condition, asking for medical evidence to support claims. (Letter from VARO Wilmington to Rollins dtd 17 May 2002).

88. Rollins filed a SSC in June 2002 complaining of skin condition, itching and depression stating that he believed his diabetes was service-connected. (SSC dtd 4 Jun. 2002)

89. In August 2002, the Wilmington RO sent Rollins a second VCAA letter asking him to give the VA assistance in getting Rollins' treatment records from Crozer Chester Hospital, Chester, PA, and from Dr. Cooper. (Letter from Wilmington RO to Rollins dtd 21 Aug. 2002)

90. Later that year, Rollins reported for a compensation & pension examination at VAMC Wilmington for a Compensation & Pension examination before Dr. Kehua LI, MD. After the examination, Rollins and Dr. Li had an argument and Li called the VA police to escort Rollins from his office. © & P Exam report dtd 4 Nov 2002)

91. Rollins' November, 2002, dermatology examination was deemed inadequate and th Wilmington RO scheduled a second examination. (Ltr from C.T. Keenan to Rollins dtd 10 Feb. 03)

92. The second examination by Dr. Christine Ambro on 24 February 2003 resulted in a diagnosis of neurodermatitis. She suggested that Rollins use Recco's special soap to reduce itching. ( C & P Exam dtd 25 Feb 2003) This second examination was also deemed insufficient. (Ltr of C.T. Keenan to VAMC Wilmington dtd 3 Mar. 2003)

93. On 15 March 2003 Rollins requested another examination for his skin condition. (Exhibit C 2326) The third examination on 27 August 2003 yielded the same results as the first and second examinations. (See C & P Exam report dtd 27 Aug. 2003)

94. Doctor Deepak Santram gave Rollins a Compensation & Pension examination on 1 September 2003 at VAMC Wilmington. He noted that Rollins had facial scars from acne and also noted Rollins' scar over his right shoulder surgical site. Doctor Santram diagnosed Rollins' condition as 1. Acne vulgaris; 2. Neurodermatitis, 3. Scar, right anterior shoulder, noting that

Rollins' shoulder scar was not affecting his range of motion. He also noted that Rollins' facial scars were neither asymmetrical or caused distortion of his features. ( C & P Exam Report dtd 1 Sep. 2003)

95. VARO Wilmington issued a September 2003 Rating Decision in Rollins' case. The RO found that Rollins had a 60 % combined service-connected disability rating. The RO granted an increase for acne vulgaris from 10% to 30%. It also granted an increase for residuals of right shoulder dislocation to 30% and continued Rollins' 10% rating for Painful scar right shoulder. The RO deferred a decision on Rollins' flat feet pending a Compensation & Pension Examination. The RO denied service-connection for Rollins' psychiatric disability and his back condition for failure to provide new and material evidence. The RO also denied TDIU benefits. (Rating Decision dtd 8 Sep.2003).

96. Following this decision, Rollins received a compensation and pension examination at VAMC Philadelphia, PA from Kishor Patil, MD who noted that Rollins carried diagnosis of hammer toes, plantar fascitis, bilateral tarsal tunnel syndrome. ( C & P Exam dtd 27 Oct 03)

**3. VA and Private Medical History: Diabetes Mellitus Type II**

97. Rollins suffered from some kind of undiagnosed general malaise in May 1979 while on active duty, initially diagnosed as a viral syndrome. He had persistent symptoms of lack of energy for the rest of 1980 and into 1989. ( Chronological Record of Medical Care dtd 8-21 May 1979)

98. Rollins had two glucose tolerance tests while in service that were within normal limits, but his symptoms persisted. (Chronological Record of Medical Care dtd 20 Nov. 1981)

99. Rollins' 1982 compensation claim asked for service connection for "recurrent viral syndrome." (Compensation claim dtd 15 Oct 1982)

100. In 1988, Rollins was correctly diagnosed as suffering from Type II Diabetes. In December, 1988, an unknown physician [signature unreadable] a member of the medical practice group Total Care Physicians, Newark, DE certified that he or she had treated Rollins for diabetes mellitus. (See Report dtd 28 Apr. 1988)

101. On 28 November 1990, Rollins was admitted to St. Francis Hospital, Wilmington, DE, for treatment of uncontrolled Diabetes Mellitus. (Discharge Summary dtd 3 Dec. 1990)

102. Rollins made a 11 January 2001 visit to VAMC Wilmington for management of Diabetes Type II (correcting error listing his Diabetes as Type I in report of medical action). (Ambulatory/Outpatient Care Note dtd 11 Jan 2001)

103. On 28 February 2000 Rollins filed a handwritten SSC to add diabetes to his claim for service connection. He stated that " I have been suffering from diabetes and diabetes related complications and medical symptoms since during my active duty time." (SSC dtd 28 Feb. 2000)

104. In August 2002 Rollins submitted a SSC complaining of skin condition, itching and depression stating that he believed his diabetes was service-connected. Rollins stated that he has residuals from "viral syndrome" and chest pain. He stated he has foot pain and chronic itching, and re-iterated his claim for TDIU because his barber shop has been closed for months. (SSC dtd 27 Aug 2002)

105. In September 2002 Rollins went to VAMC Wilmington for pharmaceuticals. He was out of medicine for diabetes. (Ambulatory/Outpatient Care Note dtd 2 Sep 2002)

106. Dr. Deepak Santram gave Rollins a Compensation & Pension exam at VAMC Wilmington in November 2002 . Santram noted that Rollins reported that his diabetic symptoms started in 1985. Santram diagnosed his condition as Diabetes Mellitus type II. ( C &P Exam Report dtd 6 Nov. 2002)

107. Rollins went to the Physical Therapy Department at VAMC Wilmington in April 2003. Doctor Delia Olympia MD, saw Rollins and took a history of diabetes & pain. She suggested land therapy and if cannot tolerate same, hydrotherapy. (Examination Report dtd 28 Apr. 2003).

108. Following that visit Rollins typed letter to Michelle Kuhn RN re orthopedic injuries, makes claim the VA doctors did not properly evaluate his private physician's reports of injuries particularly Dr. Mauriello's reports that causally related "current" condition to service injuries.(Letter from R. Rollins, Sr. to M. Kuhn (n.d.) )

109. Rollins saw Michelle Kuhn, R.N, his primary care specialist in June 2003 at VAMC Wilmington. She reported that Rollins was very frustrated that he has not been service-connected. He had sent Kuhn materials from outside specialists. His diabetes were not under control. ( Chronological Record of Care dtd 18 Jun. 2003)

110. In June 2003 Rollins saw Dr. Robert Glazer at VAMC Wilmington for an orthopedic consultation. Doctor Glazer found some small calcifications of the left femoral head in x-ray.. Rollins complained of multiple joint pain, feet, ankles neck right upper trapezius. His diagnoses were: Polyarthropathy, cause uncertain 2. Right ulnar neuropathy 3. Diabetic neuropathy 4. Stats post tarsal tunnel release bilaterally with residual pain and sensory disturbance ( Report dtd 26 Jun. 2003)

111. Doctor Delia Olympia reported in July 2003 VAMC Wilmington, that Rollins had been sent for therapy for ulnar neuropathy and diabetic neuropathy. Her impressions included an opinion that Rollins had "sensorymotor polyneuropathy" ( Report dtd 24 Jul 2003).

112. As of 22 November 2006, Rollins' Diabetes Mellitus type II claim was still under adjudication at Wilmington RO. That claim also included a claim for secondary neuropathy of the feet.

**VA and Private Medical History: Lumbar and Cervical Spinal Conditions**

113. In 2002, Rollins had a Compensation & Pension examination by Dr. Robert Glazer at

VAMC Wilmington for his orthopedic injuries. Doctor Glazer reported on two orthopedic injuries: 1. traumatic arthritis of rt. Shoulder 2. Chronic cervical strain w/ trapezius myalgia © &P Exam dtd 13 Nov. 2202). A cervical spine x-ray taken 10 November 2002 was essentially normal. (E X-ray report dtd 10 Nov. 2002)

114. Ross Grossi, PT, made a lower back evaluation on 8 May 2003 at VAMC Wilmington. He noted that Rollins was working as an instructor in a barber school until he was forced to stop in October, 2002, due to allergy to hair and back pain. Rollins reported the intensity of pain in his lower back at 7-8 on a scale of 1 to 10. Grossi noted that Rollins had severe limitations on motion in his spine. Grossi planned an outpatient course of physical therapy for Rollins to help him cope with his pain. ( Report of G. Rossi dtd 8 May 2003)

115. Doctor Robert Glazer noted during his June 2003 orthopedic consultation at VAMC Wilmington that Rollins, among other diagnoses suffered from "Polyarthropathy, cause uncertain" (Report of Dr. R. Glazer dtd 26 June 2003) As of 20 November 2006, this claim was still under adjudication by the Wilmington RO.

**VA and Private Medical History: Flat Feet**

116. Rollins' military service records showed he had bilateral acquired flat feet in 1979. (See Chronological Record of Health care for 21 Sep. 1979)

117. In June 1991 Rollins wrote to Wilmington RO proposing the following new diagnoses as

part of his claim: (1). Pronation of both feet incurred in service, (2). Flat feet bilateral, with secondary itching pain & burning in lower back. (SSC dtd 10 Jun. 1993)

118. In March 1993 the RO issued a confirmed rating decision relating to pes planus stating that "SMR's did not diagnose any chronic disability in service. The veteran apparently had a congenital disability condition which was exacerbated in service." (Rating Decision dtd 31 Mar. 1993)

119. In April 1993 the RO issued a second SSOC denying service connection for Rollins' foot condition before returning Rollins' file to the BVA. ( SSOC dtd 14 Apr. 1993)

120. Doctor Anne C. Mack made an MRI examination of Rollins' feet in July 1995 at St. Francis Hospital, Wilmington, DE, that disclosed severe bi-lateral tarsal tunnel syndrome. (MRI Examination Report dtd 25 Jul. 1995)

121. In September 1995, Drs. Andrew J. Gelman and Nathan Thomas performed a surgical release of the right tarsal tunnel. (Operative Report dtd 18 Sep. 1995) In July 1996, the same physicians performed a surgical release of the left tarsal tunnel. (Operative Report dtd 15 July 1996)

122. In January 1989, Rollins filed a handwritten document that requested that all his claims be re-opened, including the residuals from his shoulder dislocation, acne, and a nervous condition.

(SSC dtd 18 Jan. 1989)

123. In February 1989, Jerry Matson, Adjudication Officer for the Wilmington RO wrote Rollins stating that he was awarded 10% disability rating from 1 November 1984, and 40% disability rating for residuals of right shoulder dislocation from 1 February 1989. (Ltr of J. Matson to Rollins dtd 1 Feb. 1989)

124. In April 1989, Rollins underwent another orthopedic compensation & pension examination by Dr. Charles Mauriello who noted no greater impairment of range of motion in Rollins' right shoulder. Doctor Mauriello also submitted a report to the U.S. Postal Service concerning Rollins' disability on 21 August 1989. Mauriello noted that Rollins was hypertensive and diabetic, and had residuals from a low back injury. ( C & P Exam Report dtd 17 Apr. 1989)

125. The RO affirmed its earlier ratings in a May 1989 Rating Decision. ( Rating Decision dtd 26 May 1989)

126. Rollins sent in an NOD in November 1989 arguing that his lower back pain originated from an unspecified in-service injury suffered while making parachute jumps. (NOD dtd 5 Nov. 1989)

127. In November 1989, the Wilmington RO sent a Statement of the Case (SOC) to Rollins. This SOC shows that Rollins as still rated 0% service connected for residuals from his shoulder

injury and acne vulgaris. (SOC dtd 25 Nov. 1989)

128. Believing that Rollins had submitted a claim for a foot condition, the Wilmington RO issued a Rating Decision on 5 June 1992 denying service connection for a foot condition. The RO stated that "veteran was evaluated and examiner stated there were pes planus type feet bilaterally which are flexible. There was no gross deformity noted." The RO goes on to state that veteran provided evidence of continuity of symptomatology and failed to respond. "VA exam of 4/17/89 indicated the veteran does have pes planus bilaterally, but it appears that such was congenital in nature and not disabling." (Rating Decision dtd 5 Jun. 1992)

129. Rollins filed his NOD in September 1992. (NOD dtd 23 Sep. 1992) .

130. Doctor Robert Garber D.P.M. examined Rollins in December 1992, finding that he had severe bi-lateral pes planus, strain secondary to pes planus and possible tarsal tunnel syndrome. Doctor Garber did not state whether Rollins' flat feet were acquired or congenital. (C&P Report dtd 2 Dec. 1992)

131. In May 1994, Rollins was seen by Dr. David S. Guggenheim, D.P.M. for his bi-lateral foot condition. Doctor Guggenheim diagnosed Rollins as suffering from mild pes planus and diabetic neuropathy. He stated that "I am quite certain that we are dealing with a neuropathy, if not a combined neuropathy/tarsal tunnel syndrome." (Report of Dr. Guggeheim dtd 24 Mar 1994)

132. In May 1994, the Wilmington RO granted 20% service connection for "condition of the skeletal system" and 10% service connection for "eczema". According to the RO, these conditions became more than minimally disabling on 1 February 1989. (Rating Decision dtd 10 May 1994)

133. Rollins filed a statement in June 1994 that was treated as an NOD. He noted that the Rating Decision did not consider that he had a whole body itching rash and failed to grant an earlier effective date. (NOD dtd 1 Jun. 1994)

134. Doctor Kenny Cooper's last update was transmitted to the Wilmington RO which treated that information as Rollins'SSC to re-open his flat feet claim. The RO denied Rollins' claim to re-open his flat feet claim based on new and material evidence in October, 1995. (Rating Decision dtd 21 Oct. 1995)

135. Rollins filed his NOD to denial of re-opening of foot condition claim. (NOD dtd 14 Nov 1995)

136. The Wilmington RO sent Rollins an SSOC on 3 April 1996. Rollins also submitted a report from Dr . Gelman relating to his tarsal tunnel syndrome that included a second copy of Rollins' surgery and post-surgical follow-up. ( SSOC dtd 3 Apr. 1996; Letter from Rollins to VARO Wilmington with enclosure dtd 2 Apr. 1996))

137. A second SSOC was sent by the Wilmington RO to Rollins in June 1996. (SSOC dtd 21 Jun. 1996)

138. Rollins filed his substantive appeal in October 1996. (Form 9 dtd 1 Oct. 1996)

139. In November 1996, Rollins's National Service Officer submitted Rollins' written statement asking to re-open his claims for his back condition and his foot condition and re-submitted medical records from Dr. Cooper, Dr. Gelman and St. Francis Hospital relating to Rollins' foot condition. (Lttr of Dante Profile to Wilmington RO dtd 8 Nov 1996)

140. In January, 1997, the RO sent Rollins another SSOC and another Rating Decision denying service connection for foot and back condition on the ground that Rollins had failed to submit new and material evidence relating to either condition. (SSOC & RD dtd 17 Jan. 19997)

141. In10 February 1997, Rollins had a hearing before a local hearing officer relating to his foot claim. The hearing transcript related to his tarsal tunnel syndrome surgical procedures in 1995 and 1996 and to stress put on his feet during service. Rollins reported a severe episode of foot pain in December 1983 that necessitated his being evacuated from his job to the hospital. (Hearing Transcript dtd 10 Feb. 1997)

142. In February 1997, Rollins filed a claim that his back problem was service-connected and all rating decisions relating to denial of service connection for his back problem were the result

of clear and unmistakable error (CUE). Rollins also submitted SSC's from his mother, his wife and his friend Vincent Johnson relating to service- incurrence of his back injuries as a result of repeated parachute jumps. (SSC dtd 20 Feb. 1997 with attachments)

143. Johnson gave a detailed description of the July, 1983 incident when Rollins collapsed on the job from foot and back pain. Carl Ferrara, Rollins' supervisor corroborated this incident (Statements of Vincent Johnson dtd 22 Feb. 1997 and Carl Ferrara dtd 25 Feb. 1997)

144. The Hearing Officer's decision was issued in June 1997. The Hearing Officer denied service connection for Rollins' foot condition because Rollins failed to submit new and material evidence to support his claim. (Hearing Officer's Report dtd 5 Jun. 1997)

145. Rollins immediately filed a second NOD relating to this decision. (Ltr of Dante Profile to RO dtd 16 Jun. 1997)

146. Rollins then filed a written statement setting out his disagreement with the Hearing Officer's finding on his foot and back problems together with a timely Form 9. (See Lttr w/ Form 9 dtd 4 Jul. 1997)

147. The Wilmington RO sent Rollins an SSOC in July 1997 (SSOC dtd 15 Jul.1997)

148. In September 1998, the BVA issued its decision that Rollins had not submitted new and

material evidence sufficient to re-open his claims for flat feet and a back injury. It reserved a decision on his claim for TDIU benefits and remanded the claim to the Wilmington RO for further development. (BVA Decision dtd 17 Sep. 1998)

149. In October 1998, Dr. Kenny Cooper sent an update on Rollins' foot condition to the Wilmington RO stating that Rollins had chronic plantar fascitis and a poor prognosis for remission of his foot symptoms and back symptoms. (Ltr of Dr. Cooper to VARO Wilmington dtd 26 Oct. 1998)

150. The Chair of the BVA denied reconsideration of the original BVA decision in December 1998. (Ltr of Chair to Rollins dtd 30 Dec. 1998).

151. Rollins filed a timely Notice of Appeal with the U.S. Court of Appeals for Veterans Claims on 31 October 1998. (Docket U.S.CAVC No. 98-2016)

152. The Secretary filed a motion to remand on the grounds that the Chair of the BVA was inclined to reconsider the original decision which was granted on 12 February 1999. (Motion for Remand and other remedies dd 4 Dec. 1998; order dtd 12 Feb. 1999)

153. The Chair of the BVA granted Rollins a re-hearing on his claim in June, 1999. . A new BVA decision was issued in December 1999 remanding the issues of new and material evidence to re-open claim for a back disability and a foot disability for further development. (Ltr of Chair

to Rollins dtd 1 Jun. 1999; BVA Decision dtd 15 Dec. 1999)

154. Rollins went to VAMC Wilmington to see Dr. Garber for treatment of his foot disorders on 29 October 1999 and 8 January 2000.. (Podiatric Consult dtd 29 Oct. 1999; Podiatry note dtd 8 Jan. 2000)

155. Rollins' attempt to re-open his flat foot claim was rejected by the Wilmington RO in July, 2000. The RO sent Rollins a SSOC and RD denying service connection for his flat feet. ( See RD dtd 20 Jul. 2000)

156. On 22 March 2002, Rollins had a Decision Review Conference with the Wilmington RO Decision Review Officer. The Decision Review Officer requested medical records from Dr. Cooper & Dr. Turner . While the records search was pending in August 2002 Rollins submitted a SSC stating that he had foot pain among other symptoms. (SSC dtd 27 Aug. 2002)

157. On15 March 2003 Rollins wrote to Michelle Kuhn RN for another exam by other specialists for his foot condition and pain management. Kuhn noted that Rollins presents with a history of pain, worst in foot. (Ltr of Roland S. Rollins to M. Kuhn dtd n.d. 15 Mar. 03; VAMC Wilmington Progress Note dtd 15 Mar. 2003)

158. Rollins went to the VAMC Wilmington Pain Management in April 2003 and was seen by Bonnie Fairchild, RN and Dr. Olympia in Physical Therapy. ( Pain Management Clinic Progress

note dtd 28 Apr. 2003)

159. Dr. Robert Glazer, M.D. noted during a June 2003, orthopedic consultation that one of Rollins recurring problems was "Status post tarsal tunnel release bilaterally with residual pain and sensory disturbance." (Report of Dr. Robert Glazer dtd 26 Jun. 2003)

160. Rollins saw Dr. Robert Garber, D.P.M. in July, 2003. Rollins told Garber that his feet & ankles were swollen and he needed new shoes. Doctor Garber escorted Rollins to the Mental Health Clinic after an argument between Garber and Rollins. (Addendum report of Dr Robert Garber dtd 10 Jul. 2003)

161. VARO Wilmington issued a Rating Decision in Rollins' case in September, 2003. The RO gave Rollins a 60 % combined service-connected disability rating. The RO granted an increase for acne vulgaris from 10% to 30%. It also granted an increase for residuals of right shoulder dislocation to 30% and continued Rollins' 10% rating for Painful scar right shoulder. The RO deferred a decision on Rollins' flat feet pending a Compensation & Pension Examination. The RO denied service-connection for Rollins' psychiatric disability and his back condition for failure to provide new and material evidence. The RO also denied TDIU benefits. (Rating Decision dtd 8 Sep. 2003).

162. Following this decision, Rollins received a compensation and pension examination at VAMC Philadelphia, PA from Kishor Patil, MD who noted that Rollins carried diagnosis of

hammer toes, plantar fascitis, bilateral tarsal tunnel syndrome. ( C & P Exam dtd 27 Oct. 03)

163. Rollins filed a Notice of Disagreement with the September, 2003, Rating decision and also challenged denial of service connection for flat feet as clear and unmistakable error (CUE). He is awaiting adjudication of his flat feet and CUE claim which has been pending before VARO Wilmington since October, 2003.

**VA & Private Medical History: Major Depression**

164. Within 90 days after discharge Rollins was seen by Dr. Reynolds in the Outpatient Mental Health Clinic (MHC) in September, 1982, who referred Rollins to Dr. Elwood, a psychologist (Mental Health Clinic Progress Note dtd 2 Sep 1982).

165. Doctor Elwood saw Rollins on 23 November 1982 within six months after discharge. Elwood talked to Rollins and scheduled an MMPI test. Rollins took the test on 14 December. Elwood interpreted the test results as "anxiety reaction in a schizoid personality." (Progress note dated 20 Jan. 1983).

166. In March, 1983, the VA Regional Office denied any increase for Rollins' service-connected conditions. It also denied service connection for a personality disorder. (Rating Decision dtd 17 Mar. 1983)

167. In March 1983, the RO issued its Statement of the Case to Rollins relating back to his October 1982 Notice of Disagreement. No further action was taken on the denial of service-connection and that decision became final in March, 1984. (SOC dtd 28 Mar. 1983)

168. In March, 1989, Rollins went to the MHC at VAMC Wilmington complaining of outbursts of anger at his spouse, anxiety, sleep disorder and tension. He was referred to a psychiatrist for evaluation. (Report of Anna Stanton MSW dtd 22 Mar. 1989)

169. In October 1999, Rollins went to VAMC Wilmington, DE, for a Mental Health Clinic intake with Anna Stanton, MSW, who administered a Beck Depression scale showing Rollins with a score of 27 and severe symptoms of depression. (Report of Anna Stanton MSW dtd 28 Oct. 1999)

170. The Wilmington RO wrote to Rollins in April 1999 stating that his claim for a service-connected mental condition could not be adjudicated until the BVA returns his file to the RO. (Ltr from C. T. Keenan to Rollins dtd 30 Apr. 1999)

171. Rollins filed an informal SSC that listed, among other service-connected conditions, post traumatic stress disorder. (SSC dtd 29 Oct. 1999)

172. The Wilmington RO issued a Rating Decision denying service-connection for a "personality disorder" because no new & material evidence had been submitted to change the

original negative decision. (Rating Decision dtd 3 Jan. 2000)

173. In February, 2000, the Wilmington RO also decided that Rollins had failed to submit sufficient new and material evidence to re-open his claim for a service connected nervous condition. (SSOC dtd 17 Feb. 2000)

174. Rollins filed a timely notice of disagreement with the rating decision in June 2000. (NOD dtd 1 Jun. 2000)

175. In July, 2000, the Wilmington RO sent Rollins a SSOC for the personality disorder claim. The RO also sent a letter to Rollins relating to his claim for penile implant/sexual dysfunction and physical and emotional disability due to skin condition, requesting further medical information supporting these conditions. ( SSOC dtd 20 Jul. 2000; Ltr from C.T. Keenan to Roland Rollins dtd 20 Jul. 2000)

176. Doctor Alvin L. Turner Ph.D. made a psychological assessment of Rollins on 29 August 2000. Rollins was concerned about his anger. No diagnosis was made, and Turner suggested further assessment & personality testing to address issues. ( Report dtd 4 Sep 2000)

177. In December 2000 Wilmington RO notified Rollins that it will re-adjudicate his claim for sexual dysfunction and emotional condition due to skin condition. (Ltr. From C. T. Keenan to Roland Rollins dtd 27 Dec. 2000)

178. Rollins saw Carol Moffa, RN on 11 January 2001 at VAMC Wilmington, DE. She listed depression as one of Rollins' diagnoses. (Report of Carol Moffa RN dtd 11 Jan. 2001)

179. In August 2001 the Wilmington RO wrote to Rollins advising him of the Veterans Compensation Adjustment Act of 2000 (VCAA) as it related to his claim for a failed penile implant and his emotional condition due to skin problem. (Ltr from C.T. Keenan to Roland Rollins dtd 10 Aug 2001)

180. Rollins then submitted a new compensation claim for Major Depression and for medical malpractice for a failed penile implant. ( SSC dtd 7 Sep. 2001)

181. In September 20001 the Wilmington RO issued a Rating Decision denying service-connection for Rollins' failed penile implant and sexual dysfunction. The same decision also denied service-connection for any psychiatric disability due to skin condition. (Rating Decision dtd 11 Sep. 2001)

182. Rollins filed an SSC on plain paper in September 2001 asking for increase in service-connection for his skin condition and severe depression. Rollins threatened to commit suicide if he has more nightmares or itching & burning of his hands (SSC dtd 20 Sep. 2001)

183. The Wilmington RO issued a second Rating Decision in January 2002: it held that the claim was denied due to Rollins' failure to submit follow up evidence. (Rating Decision dtd 28

Jan. 2002)

184. A February 2002 Decision Review Officer's re-evaluation of Rollins' claims resulted in a request for another submission from Dr. Kenny Cooper regarding Rollins' failed penile implant & depression. (Decision Review Officer's report dtd 13 Feb. 2002).

185. Rollins submitted an SSC in June 202 in which he asserted that his skin condition was not properly evaluated. He also complained of chronic itching and depression. (SSC dtd 4 Jun. 2002)

186. In September 2002 Rollins went to VAMC Wilmington for refills of his prescriptions from Dr. Kenney Cooper. His diabetes was uncontrolled, he was out of medicine and Dr. Cooper had also prescribed Paxil for his Major Depression and he had no more antidepressants. (Ambulatory/Outpatient Care Note dtd 2 Sep. 2002)

187. Rollins returned to the Outpatient Care Clinic in September 2002 and saw Michele Janson, RN who noted that Rollins reported suicidal ideation in past, and was very depressed. (Ambulatory/Outpatient Care Note dtd 17 Sep. 2002)

188. Doctor Erlinda Busterona saw Rollins at VAMC Wilmington MHC in September 2002. She made a diagnosis that he suffered from Major Depression (Report of Dr. Erlinda Busterona dtd 18 Sep. 2002)

189. Doctor John Donnelly, a psychiatrist saw Rollins in January 2003 at VAMC Wilmington Mental Health Clinic. Donnelly reported that Rollins was angry at podiatry because he feels he has been ignored by podiatry. (Mental Health Clinic Note dtd 24 Jan. 2003)

190. In June 2003 Michelle Kuhn, RN saw Rollins and reported that he was very frustrated that he has not been service-connected. She noted that Rollins' depression has increased due to financial difficulties. (Addendum to Progress Note dtd 18 Jun. 2003)

191. Doctor E. Busterona, M.D saw Rollins at the VAMC Wilmington MHC in late June 2003. Rollins said he was in jail for a month, and needs a statement from MHC that he has improved so that he can see his children. Doctor Busterona observed that "vet appeared to be paranoid and guarded." ( Report of Dr. Busterona dtd 25 Jun. 2003)

192. Rollins saw Dr. Dr. Edward Zevin MD after the VA Police had taken Rollins into custody and escorted him to the MHC after an incident with Dr. Garber at Podiatry. Rollins was made to sit & Zevin decided that Rollins was an antisocial personality and his angry and hostile behavior was conscious and purposeful. (Note from Dr. Zevin dtd 11 Jul. 2003)

193. Rollins saw Dr. Lawrence Elwood, Ph.D. at VAMC Wilmington MHC in August 2003. Doctor Elwood reported that Rollins told him that his wife has left him due to his anger. Elwood said that "He has been through divorce & bankruptcy. Rollins is calm today." (Report of Dr. Elwood dtd 27 Aug. 2003)

194. As of 1 November 2006, Rollins' Major Depression claim was pending before the Wilmington RO.

## COUNT I

(28 U.S.C. § 1346 (Tucker Act); 10 U.S.C. § 1201 Retirement Act)

196. Plaintiff incorporates paragraphs 1 through 194 by reference in this Count of Complaint.

197. The Secretary of the Department of the Army and the Army Board for Correction of Military Records, acting under color of authority through an apparent delegation of authority to the Army Board for Correction of Military Records by the Secretary of the Army, arbitrarily and capriciously refused to re-open the discharge of Roland S. Rollins, Sr. to permit an assessment of the degree of disability Rollins suffered from on discharge from the U.S. Army and to consider the award of disability retirement pay or severance pay or other appropriate relief, as shown by copy of decision, attached, marked "Exhibit A" and made a part of this Complaint...

199. Plaintiff is entitled to an order from the Court directing the Army Board for Correction of Military Records to place Roland S. Rollins, Sr. on the Temporary Disability Retirement List effective 1 July 1982 and on the Permanent Disability Retirement List effective 30 June 1987.

199. Plaintiff is entitled to a judgment awarding him accrued disability retirement pay from 1 July 1982 through 1 June 2008 at the rate of 50% of pay for enlisted grade E-1 over three years.

WHEREFORE, Plaintiff prays for judgment against the United States in the sum of $137,725.80, the costs of this action, and for all other appropriate relief.

DATED: 10 June 2008

Thomas J. Reed
Widener University School of Law
Veterans Law Clinic
P.O. Box 7474
Wilmington, DE 19803-0474
TEL: (302) 477-2070
FAX: (302) 477-2706
E-mail: tjreed@mail.widener.edu

**DEPARTMENT OF THE ARMY**
BOARD FOR CORRECTION OF MILITARY RECORDS
1901 SOUTH BELL STREET 2ND FLOOR
ARLINGTON, VA 22202-4508

RECEIVED
JAN 2008

January 29, 2008

AR20070003177, Rollins, Roland S.

Mr. Roland S. Rollins Sr.
1321 Lancaster Ave. B
Wilmington DE 19805

Dear Mr. Rollins:

Pursuant to your request for reconsideration of ABCMR Docket Number AC85-10927, the Army Board for Correction of Military Records (ABCMR) reconsidered your case on January 25, 2008. I regret to inform you that the Board denied your request for relief. A copy of the Board's Record of Proceedings which explains the Board's reasons for denying your request is enclosed. This decision in your case is final.

Paragraph 2-15b of Army Regulation 15-185 governs requests for reconsideration by the ABCMR. This regulation allows an applicant to request reconsideration of an earlier ABCMR decision only if the request is received within one year of the original decision and it has not already been reconsidered.

Since your request has now been reconsidered, you are not eligible for further reconsideration of this same matter by this Board. However, you have the option to seek relief in a court of appropriate jurisdiction.

Sincerely,

Catherine C. Mitrano
Director, Army Board for Correction
of Military Records

Enclosure

EXHIBIT A PAGE ONE

**DEPARTMENT OF THE ARMY**
BOARD FOR CORRECTION OF MILITARY RECORDS
1901 SOUTH BELL STREET 2ND FLOOR
ARLINGTON, VA 22202-4508

EXHIBIT A

# RECORD OF PROCEEDINGS

IN THE CASE OF: ROLLINS, ROLAND S.

BOARD DATE: 25 January 2008
DOCKET NUMBER: AR20070003177

I certify that hereinafter is recorded the true and complete record of the proceedings of the Army Board for Correction of Military Records in the case of the above-named individual.

| | |
|---|---|
| Ms. Catherine C. Mitrano | Director |
| Ms. Beverly A. Young | Analyst |

The following members, a quorum, were present:

| | |
|---|---|
| Mr. David Haasenritter | Chairperson |
| Mr. James Hastie | Member |
| Mr. Edward Montgomery | Member |

The Board considered the following evidence:

Exhibit A - Application for correction of military records.

Exhibit B - Military Personnel Records (including advisory opinion, if any).

THE APPLICANT'S REQUEST, STATEMENT, AND EVIDENCE:

1. The applicant requests, in effect, reconsideration of an earlier request that his discharge be changed to a medical discharge.

2. The applicant states that he was mistakenly administratively discharged and he could have been qualified for a chapter 13 discharge for service-connected disabilities. He states that he is now rated at 60 percent disabled by the Department of Veteran Affairs (DVA). He alleges that he was chronically disabled and should have been sent home due to disabilities and not for unsuitability. He also states that a complete physical was not properly done and he was on a P-3 profile for his right shoulder, back, feet, and ankles. He states that these conditions were overlooked and are currently a part of CUE (clear and unmistakable error) pending before the DVA. He states that it took DVA many years to help him, through no fault of his own, and it has been out of control for over 24 years.

3. The applicant provides a sworn affidavit; a supplemental letter, dated 15 December 2006; and numerous medical documents.

COUNSEL'S REQUEST, STATEMENT AND EVIDENCE:

1. Counsel states, in effect, that the applicant submits a request for correction of his discharge in the interest of justice because he has been at least 60 percent disabled as a result of several service-connected conditions at the time of his release from active duty. Counsel states the applicant did not receive a medical board nor was his disability reviewed by a Physical Evaluation Board (PEB).

2. Counsel provides a brief in support of the applicant's application in which he describes the history of the applicant's medical condition. In August 1979, the applicant dislocated his shoulder playing football. He was later diagnosed as suffering from chondromalacia [anterior knee pain due to irritation of the cartilage on the undersurface of the kneecap] of the left knee and bilateral flat feet. In April 1980, the applicant stepped in a hole and injured his left knee and shin. He went on sick call and was given a diagnosis of contusion mid-tibia. On 7 April 1980, the applicant dropped a heavy loudspeaker on his right foot. The applicant was seen for a soft tissue injury to his foot at sick call and was treated. He was put on a temporary profile "no running" and "no jumping" for 7 days.

3. Counsel states the applicant was involved in a jeep accident on 12 May 1980 at Fort Bragg, North Carolina. The applicant re-injured his back and left foot on 26 August 1980 while moving heavy equipment. He went on sick call the next day and was diagnosed as suffering from contusions and a sprain. The applicant

was initially diagnosed as having viral syndrome in November 1980. On 16 March 1981, carburetor cleaner splashed on the applicant's face and hands, causing acid burns. The applicant later developed an itchy rash on his face and body. He was seen by a dermatologist at Womack Army Hospital and was diagnosed as having acne vulgaris.

4. Counsel states the applicant submitted a compensation claim for service-connected recurrent right shoulder dislocation, skin disease, a prescription for eye lenses, and viral syndrome. He submitted a Statement in Support of Claim (SSC) in September 1982 requesting that "personality disorder" be added to the list of service-connected conditions. The applicant was referred to a psychologist in the Outpatient Mental Health Clinic and was scheduled for an MMPI test (psychological test). The psychologist interpreted the test results as "anxiety reaction in a schizoid personality."

5. Counsel further states that the Wilmington Veterans Affairs Regional Officer (VARO) made a rating decision which granted the applicant zero percent service connection for acne vulgaris and chronic right shoulder pain. The Rating Decision denied service connection for personality disorder, refractive error, and viral syndrome. The applicant filed a Notice of Disagreement (NOD) on 20 October 1982. VARO dismissed his claims in January 1983 for failure to report for a physical examination. By 1988, a civilian physician diagnosed the applicant as suffering from Type II Diabetes (Diabetes Mellitus).

6. In May 1994, the Wilmington VARO granted the applicant a 20 percent service connection disability rating for residuals from his chronic dislocated right shoulder and 10 percent for his skin rash. Counsel states that the applicant received an orthopedic compensation and pension examination at the Wilmington Veterans Affairs Medical Center (VAMC). He was found to have traumatic arthritis of the right shoulder and chronic cervical strain with trapezius myalgia. Counsel also states the applicant filed a claim for service connection for personality disorder. The Wilmington VARO denied his claim for a personality disorder because the applicant had not submitted any new material evidence.

7. In 2003, the Wilmington VARO increased the applicant's disability rating from 20 percent to 30 percent for residuals of the applicant's right shoulder dislocation. Counsel states the applicant was examined on 1 September 2003 at the Wilmington VARO. The physician diagnosed the applicant as having acne vulgaris; neurodermatitis; and a scar on his right anterior shoulder, noting that the applicant's shoulder scar was not affecting his range of motion. On 8 September 2003, the Wilmington VARO found that the applicant had a 60 percent combined service-connected disability rating. His disability rating increased to 30 percent

for acne vulgaris, 30 percent for residuals of right shoulder dislocation, and continued 10 percent disability rating for painful scar on his right shoulder.

8. Counsel states the applicant seeks review of his discharge for a personality disorder because he was suffering from major depression, a severe chronic mental disease or disorder, at the time of his discharge. Counsel states the applicant's discharge was not voluntary within the meaning of Title 28, United States Code, section 1491. Counsel states the applicant was entitled to a review of his mental condition by a medical board due to an extended history of symptoms of major depression incurred on active duty. Counsel continues to stated that the applicant requests to be placed on disability retirement and that he be awarded appropriate relief under Title 10, United States Code, section 1201.

9. Counsel alleges that the applicant was discharged in violation of Army Regulations as outlined in the Military Personnel Manual. The applicant's service medical records do not reflect he had a pre-discharge medical evaluation. Counsel states there is no evidence that the Army psychologist or Army physician opined the applicant had a personality disorder in April 1982. Counsel further alleges the applicant was not referred to an orthopedic surgeon or to a dermatologist for an opinion on his chronic shoulder separation and his chronic skin rash.

10. Counsel alleges that the Army's failure to seek a complete mental and physical assessment prior to the applicant's discharge resulted in his separation from the service without a full evaluation of the nature and extent of his disability.

11. Counsel provides the applicant's DVA medical records, his military service and medical records, and his civilian medical records.

<u>CONSIDERATION OF EVIDENCE</u>:

1. Incorporated herein by reference are military records which were summarized in the previous consideration of the applicant's case by the Army Board for Correction of Military Records (ABCMR) in Docket Number AC85-10927 on 7 January 1987.

2. The applicant submitted new evidence (the medical records) that will be considered by the Board.

3. The applicant underwent a medical examination on 1 February 1979 for the purpose of enlistment. He completed a Standard Form 93 (Report of Medical History) in which he marked "Yes" under item 11 indicating that he had or

currently had swollen or painful joints; frequent or severe headache; chronic or frequent colds; severe tooth or gum trouble; head injury; broken bones; bone, joint, or other deformity.

4. The applicant enlisted in the Regular Army on 28 February 1979. He completed basic combat training at Fort Dix, New Jersey and was reassigned to Fort Sam Houston, Texas for advanced individual training (AIT). At the completion of AIT, he was awarded military occupational specialty 91B (medical specialist). He later completed basic airborne training and was assigned to the 82d Airborne Division at Fort Bragg, North Carolina as a medical aidman.

5. On 11 May 1979, the applicant was placed on a temporary physical profile for subsiding viral syndrome with residual weakness and was given a physical profile of T311111, to expire on 21 May 1979. His assignment limitations were listed as no running, marching or physical training (PT). The profile indicated the applicant would require extra rest and he should not perform any duties other than attending classes.

6. On 21 May 1979, the applicant was placed on a temporary physical profile for viral syndrome, to expire on 31 May 1979. His assignment limitations were listed as no running, marching, PT, or standing in formation over 5 minutes.

7. The applicant was promoted to specialist four on 1 August 1980. He was discharged on 6 October 1981 for the purpose of immediate reenlistment.

8. He reenlisted on 7 October 1981 for a period of five years.

9. On 2 February 1982, the applicant was treated for a complaint of recurrent right shoulder dislocation.

10. On 11 February 1982, the applicant accepted nonjudicial punishment (NJP) under Article 15, Uniform Code of Military Justice (UCMJ) for failing to go to his appointed place of duty.

11. The applicant underwent a psychiatric evaluation on 26 April 1982. The psychiatrist stated the applicant met retention standards under the provisions of Army Regulation 40-501 and there was no psychiatric disease or disorder which warranted disposition through medical channels. Also, the psychiatrist stated the applicant was mentally responsible, was able to distinguish right from wrong and adhere to the right, and had the mental capacity to participate in board or court proceedings. The clinical interview found the applicant suffered from a mixed personality disorder with borderline, narcissistic, histrionic, and antisocial

features. The psychiatrist recommended administrative discharge under the provisions of Army Regulation 635-200, chapter 13, paragraph 4b.

12. On 28 April 1982, the applicant accepted NJP under Article 15, UCMJ for disobeying a lawful command.

13. On 3 May 1982, the applicant's parachutist pay was terminated after his parachutist special qualification identifier was withdrawn.

14. On 20 May 1982, the applicant was treated for a complaint of recurrent right shoulder dislocation.

15. On 24 May 1982, the applicant accepted NJP under Article 15, UCMJ for failing to go to his appointed place of duty.

16. On 2 June 1982, the applicant's unit commander notified him of pending separation action under the provisions of Army Regulation 635-200, paragraph 13 for unsuitability-personality disorder . He was advised of his rights.

17. The applicant acknowledged receipt of the notification, consulted with legal counsel, requested consideration of his case by a board of officers, and submitted statements in his own behalf. He stated that he preferred a board of officers to hear his case and a board of medical officers to review his recent and past medical documents. He also stated that he would like to receive an honorable discharge if an administrative discharge was in effect. He further stated that his previous honorable discharge should be recognized for his past performance as a member of his unit for over three years.

18. On 2 June 1982, the unit commander recommended that the applicant be separated from the service due to unsuitability-personality disorder under the provisions of chapter 13, Army Regulation 635-200. The unit commander stated the applicant's duty performance was grossly substandard. He also stated the applicant was constantly late for work and formations, had no regard for authority, and showed absolutely no desire to improve. The unit commander requested a waiver of the rehabilitative transfer requirement.

19. On 2 June 1982, the applicant underwent a mental status evaluation. It was determined that the applicant was mentally responsible, had the mental capacity to understand and participate in board proceedings, and met the retention requirements of chapter 3, Army Regulation 40-501.

20. The applicant underwent a separation medical examination on 2 June 1982. His Report of Medical Examination indicates he had chronic right shoulder

dislocation and had been on profile for about three years. The examining physician recommended the applicant have follow-up at an orthopedic clinic. The applicant was qualified for separation. He was given a PULHES 131121 but was found to be qualified for the chapter 13 discharge.

21. On 11 June 1982, the separation authority approved the separation, waived rehabilitation requirements, and directed issuance of an Honorable Discharge Certificate.

22. On 21 June 1982, the applicant was placed on a temporary physical profile for recurring dislocation of his right shoulder and was given a physical profile of 1T31111, to expire on 21 July 1982. His assignment limitations were listed as no crawling, no hand to hand combat or contact sports, no handling of heavy materials, no overhead work, no push-ups or pull-ups, no climbing of rope or ladder.

23. The applicant was honorably discharged on 1 July 1982 under the provisions of Army Regulation 635-200, paragraph 13-4b for unsuitability-personality disorder. He completed 8 months and 25 days of active military service during the period under review. He completed 3 years, 4 months, and 4 days total active military service.

24. The applicant submitted a sworn affidavit, dated 14 December 2006, in support of his claim. He gives a description of his medical conditions to include his shoulder dislocation, flat feet, knee injury, back injury, pro-dromal diabetes symptoms, facial acid burns, and acne vulgaris.

25. Chapter 13 of Army Regulation 635-200 applied to separation for unsuitability. At that time, paragraph 13-4b provided for the separation of individuals for personality disorder. This regulation stated that as determined by medical authority (i.e., the diagnosis will have been established by a physician trained in psychiatry and psychiatric diagnosis) and described in the Diagnostic and Statistical Manual (DSM II) of Mental Disorders, 2nd Edition, Committee on Nomenclature and Statistics, American Psychiatric Association, Washington, DC 1968) this condition is a deeply ingrained, maladaptive pattern of behavior of long duration which interferes with the member's ability to perform duty. Exception: Combat exhaustion and other acute situation maladjustments. From an Army medical viewpoint, every member who is correctly diagnosed as having a personality disorder is capable of controlling his/her actions, and no member may be discharged pursuant to this paragraph unless he/she meets Army medical standards for retention.

26. Effective 1 April 1982, Army Regulation 635-200 was changed to eliminate the requirement to offer an administrative discharge board for Soldiers with less than 6 years service for separation under the unsuitability provision.

27. Army Regulation 635-40 (Physical Evaluation for Retention, Retirement, or Separation) governs the evaluation of physical fitness of Soldiers who may be unfit to perform their military duties because of physical disability. The unfitness is of such a degree that a Soldier is unable to perform the duties of his/her office, grade, rank or rating in such a way as to reasonably fulfill the purposes of his/her employment on active duty. In pertinent part, it states that the mere presence of an impairment does not, of itself, justify a finding of unfitness because of physical disability. In each case, it is necessary to compare the nature and degree of physical disability present with the requirements of the duties the Soldier reasonably may be expected to perform because of his or her office, grade, rank, or rating.

28. Chapter 7 (Physical Profiling) of Army Regulation 40-501 (Standards of Medical Fitness) provides that the basic purpose of the physical profile serial system is to provide an index to the overall functional capacity of an individual and is used to assist the unit commander and personnel officer in their determination of what duty assignments the individual is capable of performing and if reclassification action is warranted. Four numerical designations (1-4) are used to reflect different levels of functional capacity in six factors (PULHES): P-physical capacity or stamina, U-upper extremities, L-lower extremities, H-hearing and ears, E-eyes, and S-psychiatric. Numerical designator "1" under all factors indicates that an individual is considered to possess a high level of medical fitness and, consequently, is medically fit for any military assignment. Numerical designators "2" and "3" indicate that an individual has a medical condition or physical defect which requires certain restrictions in assignment within which the individual is physically capable of performing military duty. The individual should receive assignments commensurate with his or her functional capacity.

29. Army Regulation 40-501 (Standards of Medical Fitness), paragraph 3-31 of the version in effect at the time, stated that personality disorders could render an individual administratively unfit rather than unfit because of physical disability. Interference with performance of effective duty in association with this condition would be dealt with through appropriate administrative channels.

30. Army Regulation 40-501, paragraph 3-12(b) of the version in effect at the time, did not list shoulder dislocation or recurrent shoulder dislocations as a cause for referral to a Medical Evaluation Board.

31. Title 38, U. S. Code, sections 1110 and 1131, permits the DVA to award compensation for a medical condition which was incurred in or aggravated by active military service. The DVA, however, is not required by law to determine medical unfitness for further military service.

DISCUSSION AND CONCLUSIONS:

1. The applicant was discharged under the provisions of paragraph 13-4b of Army Regulation 635-200 for unsuitability due to personality disorder.

2. The applicant consulted with military counsel, requested a hearing by a board of officers (which at that time was no longer required for Soldiers with less than 6 years of service), and submitted statements in his own behalf.

3. The evidence of record shows the applicant was evaluated by a psychiatrist and was diagnosed as having a mixed personality disorder with borderline, narcissistic, histrionic, and antisocial features. However, a personality disorder is not a condition that is a cause for referral to a physical disability board. Interference with performance of effective duty in association with this condition will be dealt with through appropriate administrative channels. The applicant was administratively separated for this reason.

4. It is acknowledged that the applicant's medical problems began around 1979. He was placed on temporary physical profile for subsiding viral syndrome with residual weakness. There is no evidence that he was subsequently placed on a profile, temporary or permanent, for this condition. He was also placed on a temporary physical profile for recurring dislocation of his right shoulder in June 1982.

5. The applicant's Report of Medical Examination indicates he had chronic right shoulder dislocation and had been on profile for about three years. Other medical evidence indicates that he had been treated for recurrent right shoulder dislocation. However, there is no evidence to show that he had been on profile for this condition for other than the one temporary profile noted above.

6. At the time, recurrent shoulder dislocations was not a condition listed as a cause for referral to a Medical Evaluation Board.

7. It is also noted that the applicant was promoted to specialist four on 1 August 1980, he was qualified to reenlist on 7 October 1981, and his parachutist pay was not terminated until May 1982. The two former actions were taken when the applicant was allegedly on a profile for chronic right shoulder dislocation. The latter action was not taken until after he had been assigned to an airborne unit for

almost 3 years, indicating that he felt sufficiently capable of performing his duties by accepting the parachutist pay. All three of those actions are indicators that neither his shoulder condition nor any other condition rendered him unfit to perform his military duties.

8. The applicant was found qualified for separation under the provisions of Army Regulation 635-200, chapter 13. The examining physician recommended the applicant follow-up at an orthopedic clinic regarding his right shoulder dislocations; however, that would have been a proper recommendation for a Soldier whose shoulder condition did not render him unfit for his military duties yet required follow-on treatment by other agencies, such as the DVA.

9. Although the applicant contends that he should have been medically discharged, the preponderance of evidence shows that his medical conditions did not render him medically unfit to perform his duties or justify physical disability processing.

10. It is noted that the applicant applied to the DVA for service connected compensation and was awarded a combined disability rating of 60 percent for residuals of right shoulder dislocation, for acne vulgaris, and painful scar on his right shoulder.

11. However, the rating action by the DVA does not necessarily demonstrate an error or injustice on the part of the Army. The DVA, in accordance with its own policies and regulations, awards compensation solely on the basis that a medical condition does exists and that said medical condition reduces or impairs the social or industrial adaptability of the individual concerned. Consequently, due to the two concepts involved, an individual's medical condition, although not considered medically unfitting for military service at that time of processing for separation, discharge or retirement, may be sufficient to qualify the individual for DVA benefits based on an evaluation by that agency.

BOARD VOTE:

________ ________ ________ GRANT FULL RELIEF

________ ________ ________ GRANT PARTIAL RELIEF

________ ________ ________ GRANT FORMAL HEARING

________ ________ ________ DENY APPLICATION

BOARD DETERMINATION/RECOMMENDATION:

The evidence presented does not demonstrate the existence of a probable error or injustice. Therefore, the Board determined that the overall merits of this case are insufficient as a basis to amend the decision of the ABCMR set forth in Docket Number AC85-10927, dated 7 January 1987.

CHAIRPERSON



p.1 Jan 31 08 03:55p